UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES KENNETH McAULEY,            )
TERRENCE FRANCES McAULEY,         )
MATTHEW REDDEN McAULEY,           )
AIDAN PAUL McAULEY, KATHLEEN      )
ANNE McAULEY, and MARY FRANCES    )
BARZEE,                           )
                                  )
        Plaintiffs,               )
                                  )
    vs.                           )        Case No.  4:05CV1826 AGF
                                  )
FEDERAL INSURANCE COMPANY,        )
CHUBB GROUP OF INSURANCE          )
COMPANIES, ANHEUSER-BUSCH         )
EMPLOYEES BENEFITS TRUST, and     )
ANHEUSER-BUSCH COMPANIES, INC.,   )
                                  )
        Defendants.               )

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross motions for summary

judgment, on remand from the Eighth Circuit Court of Appeals.[1]  Plaintiffs brought this

action pursuant to the Employment Retirement Income Security Act (ERISA), 29 U.S.C.

§ 1132(a), as the beneficiaries of  Terry McAuley ("Mr. McAuley").  Mr. McAuley, as an

employee of Defendant Anheuser-Busch Companies, Inc. ("Anheuser-Busch"), was covered

under two ERISA-governed accidental death insurance policies issued by Defendant Federal

Insurance Co. ("Federal")[2] to Anheuser-Busch.  Plaintiffs challenge the denial of benefits

---

[1]    The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

[2]    The record indicates that Federal was part of Chubb Group of Insurance
Companies.  Reference herein to Federal encompasses Chubb Group where relevant.

totaling $1,129,696 under these policies, following Mr. McAuley's tragic death due to pulmonary thromboemboli, caused by deep vein thrombosis ("DVT"), several hours after a June 28, 2004 business-related airplane trip from Ireland to St. Louis, Missouri (with a stop-over in Chicago, Illinois).  Defendants argue that Mr. McAuley's death was not an accidental death caused by an accident or by "unavoidable exposure to elements," as required by the policies' coverage clauses; and, alternatively, that Mr. McAuley's death resulted from an illness, disease, or bodily malfunction, which the policies excluded from coverage.

The parties' main arguments regarding coverage under the policies were presented to this Court previously in the context of a motion to dismiss filed by Defendants, the policies in question having been attached to Plaintiffs' complaint.  Defendants conceded for the purpose of their motion that this Court should apply a de novo standard of review to the decision denying benefits, and the parties had agreed that the basic facts of the case were undisputed.  By Memorandum and Order dated September 7, 2006, this Court granted Defendants' motion to dismiss and entered judgment accordingly.

On appeal, the Eighth Circuit Court of Appeals determined that this Court had inappropriately decided the matter on a motion to dismiss because this Court had relied on facts that were not in the record.  McAuley v. Fed. Ins. Co., 500 F.3d 784, 787-88 (8th Cir. 2007).  The Eighth Circuit remanded the case for the creation of a summary judgment record, including the administrative record, and for reconsideration, noting that the administrative record would allow this Court to determine whether Defendants' suggested bases before this Court for the denial of benefits were post hoc rationalizations.  The

2

appellate court further stated that the administrative record might provide medical evidence illuminating the application of the "bodily malfunction" exclusion from coverage and the "unavoidable exposure to elements" extension of coverage.  Id.

Upon remand, Plaintiffs were given leave to conduct discovery regarding the standard of review and any conflict of interest.  The parties thereafter filed cross motions for summary judgment, providing the Court with the complete administrative record, and the Court heard oral argument.  Upon review of the entire record, and for the reasons set forth below, Defendants' motion for summary judgment shall be granted and Plaintiffs' motion shall be denied.  So that the current decision is complete in itself, the Court will  present the background facts in full, rather than refer to the previous decision.

## BACKGROUND

### The Insurance Policies

As part of its employee benefits plan, Anheuser-Busch provided Mr. McAuley with accident insurance under two policies issued by Federal.  Each policy was entitled "Blanket Accident Insurance," and contained the following coverage clause:[3] "We will pay the applicable **Benefit Amount** if an accident results in a **Loss** [defined as including the Accidental Loss of life] not otherwise excluded.  The accident must result from a covered **Hazard** and occur during the policy period.  The **Loss** must occur within one (1) year of the accident."

---

[3]    When quoting from the policies, the Court will bold those words/terms that appear in bold in the policies.  The policies explain that such words/terms are defined therein.

Section III, the "Hazards" section of each policy, stated: "The following are the **Hazards** during which coverage applies." One policy, which the parties refer to as the Blanket Accident Policy (Policy No. 6410-09-41, Pls. Ex. 1, hereinafter "Policy A"), covered the period of July 1, 2002, to July 1, 2005, and had an applicable benefit amount of $129,696 (Mr. McAuley's annual salary at the time of his death) for accidental loss of life. It listed two Hazards: "24 Hour Business and Pleasure," and "Common Carrier Business and Pleasure." The other policy, which the parties refer to as the Business Travel Accident Policy (Policy No. 6475-30-34, Pls. Ex. 2, hereinafter "Policy B"), covered the period of January 1, 2004, to January 1, 2005. Policy B had an applicable benefit amount of $1,000,000 for accidental loss of life. Policy B listed two Hazards for the class of employees to which Mr. McAuley belonged: "Business Travel" and "Felonious Assault."

Both policies defined "Hazard" as "the covered circumstances for which this insurance is provided as stated in Section III of the Declarations, Hazards, and described in the Hazards form." The Hazard form for the "24 Hour Business and Pleasure" hazard in Policy A defined this hazard to mean "all circumstances, subject to the terms and conditions of this policy, to which the Insured Person may be exposed." The Hazard form for the "Common Carrier Business and Pleasure" hazard in Policy A defined this hazard to mean "the circumstances, subject to the terms and conditions of this policy, arising from and occurring while the Insured Person is in, entering, exiting or being struck by a conveyance operated by a common carrier . . . ."

The Hazard form for the "Business Travel" hazard in Policy B stated as follows:

4

**Business Travel Hazard** means all circumstances, subject to the terms and conditions of the policy, arising from and occurring while the **Insured Person** is traveling on assignment by or at the direction of the Policyholder [Anheuser-Busch]. **Business Travel Hazard** does not include **Commutation**.

Coverage begins at the actual start of a trip whether the point of origin is from the **Insured Person's** residence or regular place of employment, whichever occurs last. Coverage ends immediately upon return to the **Insured Person's** residence or regular place of employment, whichever occurs first.

Both policies included under "Extensions of Coverage," the term "Exposure," stating as follows: "Accident includes unavoidable exposure to elements arising from a covered **Hazard**."[4] Both policies also contained the following "Disease or Illness" exclusion from coverage:

This insurance does not apply to [accidental loss of life] caused by or resulting from an Insured Person's emotional trauma, mental or physical illness, disease, pregnancy, childbirth or miscarriage, bacterial or viral infection, or bodily malfunctions. This exclusion does not apply to [accidental loss of life] resulting from an **Insured Person**'s bacterial infection caused by an accident or from accidental consumption of a contaminated substance.[5]

**The Summary Plan Descriptions**

Anheuser-Busch provided its employees with three Summary Plan Descriptions ("SPD") relevant to this case: an Eligibility SPD (Pls. Ex. 3), a Life and Accidental Death and Dismemberment Insurance SPD ("Accidental Death SPD") (Pls. Supp. Ex., Doc. #81),

---

[4]     The other extension of coverage was for "Disappearance."

[5]     Other exclusions included, for example, an "Aircraft Pilot or Crew" exclusion, which provided that the insurance did not apply to "an accident occurring while an Insured Person is in, entering, or exiting any aircraft while acting or training as a pilot or crew member"; and a "Suicide or Intentional Injury" exclusion.

and a Business Travel Accident Plan SPD (Pls. Ex. 5). Each of the SPDs stated that it was "one of the official plan documents."

The Eligibility SPD, updated as of January 1, 2003, identified Anheuser-Busch (the company) as the plan sponsor and as the plan administrator, and provided as follows, under the heading, "Interpretation of the Plan":

> As plan administrator, the company has complete discretion to interpret the plan provisions and determine who is eligible for coverage under the programs referred to in this booklet. Any ambiguous or incomplete term in the plan will be interpreted by the company except where this responsibility has been delegated to a claims administrator.
>
> The claims administrators under each program have complete authority and discretion to determine the proper payment of any claim or to make any related determination under that program. In determining the right of any covered person to a benefit for which the plan purchases insurance, such as life insurance, the insurance company, rather than the company, will make final benefit determinations.

(Pls. Ex. 3 at 31.)

The Accidental Death SPD included the following in the introductory paragraph, "About Your Benefits":

> This booklet, along with applicable portions of the eligibility booklet, serves as a summary plan description (SPD) for your life and AD&D insurance plan and serves as one of the official plan documents until it is amended or superseded. These benefits are provided entirely by insurance, and the insurance contracts govern in the event of any conflict.

(Pls. Supp. Ex. at 1.) This SPD also stated, in relevant part: "Accidental death . . . benefits are payable in the case of the following losses while you are covered: Accidental death: 100% of your coverage amount." Id. at 6. Excluded from coverage were losses connected

with, among other things, "sickness, diseases or infections of any kind except bacterial

infections due to accidental ingestion of contaminated substances or pyogenic infection from

an injury."  Id. at 7.

> The Business Travel Accident SPD stated as follows in the introductory section:

> This booklet, along with applicable portions of the eligibility booklet,
> serves as a summary plan description (SPD) for the BTA plan and serves
> as one of the official plan documents until it is amended or superseded.
> This booklet and the eligibility booklet are not intended to replace any
> other official plan documents, such as insurance contracts, which govern
> in the event of a conflict.

(Pls. Ex. 5 at 1.)

> The Business Travel Accident SPD further provided, in relevant part,

> The business travel accident (BTA) insurance plan is designed to provide
> benefits to you and your beneficiary when you are injured while
> traveling on company business.  Benefits are available for accidental
> death, dismemberment, loss of sight, hearing and speech."  BTA benefits
> are paid if you die . . . due to an accident that happened while you were
> traveling on company business as an active employee.  The loss must
> occur within 365 days of the date of the accident.

Under the "Exclusions" section, the Business Travel Accident SPD stated: "Benefits are not

paid for losses connected with: physical or psychiatric conditions not related to the accident

[or] . . . sickness or disease, unless it occurs as the result of an accident and is native to any

foreign country."  (Pls. Ex. 5 at 1, 3, 6.)

> The Accidental Death SPD identified the claims administrator as AIG Life

Insurance Company ("AIG").  By a written Summary of Material Modifications ("SMM")

attached to this SPD, employees were notified that the carrier for this insurance as of July 1,

2002, was Federal.  The Business Travel Accident SPD identified the claims administrator

as National Accident Insurance Underwriters ("National"). This SPD does not contain an SMM. According to the November 28, 2007 deposition testimony of Marcia Webster, Anheuser-Busch's Manager of Benefit Planning and Analysis since 2001, Anheuser-Busch changed insurance carriers for the subject policies from AIG and National to Federal in July 2002; and in November 2002, Anheuser-Busch sent a notice to its employees of the change. Ms. Webster testified that Anheuser-Busch prepared an SMM about this change but did not prepare new SPDs after Federal became the insurer. (Pls. Ex. 10 at 12-17.)

Ms. Webster further testified that Federal was the claims administrator for both of the subject policies and, pursuant to an agreement with Anheuser-Busch, was the "decision-maker" as to whether claims were approved. However, she could not identify any specific agreement between Federal and Anheuser-Busch that delegated that authority to Federal. Id. at 44-47.

**The Insured's Death and the Administrative Denial of Benefits**

The record establishes that on June 24, 2004, Mr. McAuley, then 56 years of age, traveled on a commercial airline from his home in St. Louis, Missouri, to Ireland, via Chicago, Illinois. He returned home on June 28, 2004, flying from Ireland to Chicago and then shortly thereafter on a connection flight to St. Louis. Mr. McAuley's five-day trip to Ireland was a business trip made as part of his work for Anheuser-Busch. The flight from Ireland to Chicago was approximately 8 hours and 15 minutes. (Pls. Ex. 14.) After arriving home, at approximately 9:30 p.m., Mr. McAuley retired for the evening. The next morning, it was discovered that he had died during the night.

Mr. McAuley's Certificate of Death listed arteriosclerotic heart disease as the "immediate cause" of death. (Pls. Ex. 11.) An autopsy performed on August 7, 2004, revealed extensive and massive bilateral acute pulmonary embolism, moderate hypertensive cardiovascular disease, up to 40% stenosis in various arteries, and mild emphysema. The autopsy report concluded that "the immediate cause of death was extensive and massive acute bilateral pulmonary thromboemboli." Id.

On September 28, 2004, Plaintiffs filed an "Accidental Death" claim for benefits under the two above policies. Plaintiffs asserted that the cause of death was acute bilateral pulmonary thromboemboli, and that the "embolisms or blood clots that caused Mr. McAuley's death was the result of his plane flight earlier that day from Ireland." With regard to the claim itself, Plaintiffs maintained that

> the formation of blood clots or embolisms in Mr. McAuley's body fit squarely within the definition of 24 hour business travel hazard set forth in the policy and also fits within the definition of exposure which includes unavoidable exposure to elements arising from a covered hazard. As you are probably aware, the risks of blood clots attendant to long international flights is a well documented hazard of such travel.

(Pls. Ex. 11).

In connection with their claim, Plaintiffs submitted a letter dated February 11, 2005, from pulmonologist John Lynch, M.D., who had reviewed the circumstances of Mr. McAuley's death, some of Mr. McAuley's medical records, and the autopsy report. Dr. Lynch stated that 40% of patients with pulmonary emboli do not survive, "with a significant fraction dying shortly after the embolization occurs." Dr. Lynch wrote that medical literature suggested that 65% to 90% of all pulmonary emboli arise from DVT -- blood clots

in the lower extremity or pelvic veins.  Dr. Lynch further stated that approximately one-third of DVT cases were caused by congenital predisposition, with the remaining two-thirds caused by acquired risk factors, the long list of which included as the most common malignancy, recent surgery or trauma, pregnancy, and immobilization (stasis).  (Pls. Ex. 9.)

According to Dr. Lynch, studies had quantified the increased risk of DVT associated with "prolonged air flights causing stasis."  One study suggested a four-fold increased risk of DVT in the two weeks following a "long haul" air flight, and another study suggested that the risk increased with progressively longer flights.  Dr. Lynch did not believe that Mr. McAuley's "underlying chronic medical problems" contributed to his death, and that the "only identifiable risk factor for [DVT] and subsequent pulmonary embolism was the long airline flight" from Ireland.  He concluded that Mr. McAuley was "one of an exceedingly small number of patients who by chance alone suffer a fatal pulmonary embolism caused by prolonged air travel."  Id.

On June 3, 2005, Federal denied the claim for benefits.  Federal reasoned that under the terms of the policies in question, Mr. McAuley had to demonstrate

> that an Accident resulted in a bodily **Injury** (in this case death) which itself was accidental.  Moreover, such bodily **Injury** must be the direct source of the death, be independent of disease, illness or other cause and must not otherwise be excluded under the Policies.  In other words, . . . it must be shown that an accident directly caused an accidental death, free of any excluded causes.

(Pls. Ex. 6.)  Federal continued that even conceding as plausible Dr. Lynch's opinion that the only identifiable risk factor for Mr. McAuley to develop DVT and subsequent pulmonary emboli was the long airplane flight, and even accepting that such a death "can be

characterized as an unforeseen and unexpected result of the flight," the policies

> only provide coverage where the means which produced such result were
> themselves accidental and were not the result of bodily malfunction,
> illness or disease or other cases [sic]. . . . Indeed, it was not an accident
> that Mr. McCauley [sic] embarked on the flight and placed himself in a
> situation where he would be at risk of sustaining a DVT (i.e.
> confinement on a plane for a long period of time). Moreover, the DVT,
> even if it can be shown not to have resulted from any illness or disease,
> at the very least must be the result of bodily malfunction or a natural
> cause, thereby taking the death out of the Policies' definition of
> **Injury(ies)** and/or making it subject to the Policies' **Illness or Disease**
> exclusion.

Id.

On July 29, 2005, Plaintiffs filed an administrative appeal, in connection with

which they submitted the July 27, 2005 letter of pulmonologist Thomas Hyers, M.D., and a

"Consultant Report and Analysis of Death" dated August 19, 2005, prepared by

pulmonologist George Matuschak, M.D. As had Dr. Lynch, both of these doctors reviewed

some of Mr. McAuley's medical records, the circumstances of his death, and the autopsy

report. Dr. Hyers opined that Mr. McAuley died of acute pulmonary embolism, and that he

> died as the result of immobilization, dehydration and other as yet
> unidentified risk factors, all of which were and are associated with the
> long flights to and from Ireland over the weekend of June 24-28, 2004.
> Longer airplane flights (greater than 5 hours) are a known risk factor for
> . . . DVT and pulmonary embolism, although the condition is rare and
> the absolute risk to air travelers is low. . . . Some of the airlines are
> aware of the risk and publish suggested, if unproven, remedies in their
> in-flight magazines.

> In the medical sense, venous thrombolism is a disease in that it has
> known causes, identified acute clinical presentations and a well-
> described acute patho-physiology. However, in Mr. McAuley's case,
> pulmonary embolism was an acute complication of the long flight. In
> this sense it is an accident associated with the flight. He had no history

> of prior events and no other identified risk factors other than the two
> flights over five days.  Since death from this condition is rare, even after
> long-distance flights, in the absence of prior events or known risk
> factors, Mr. McAuley would not have been expected to appreciate any
> substantially increased risk to him personally from the two flights.

(Pls. Ex. 14).

Dr. Matuschak opined that there was "exceedingly strong and markedly compelling evidence that Mr. McAuley's flight of June 29th [sic], 2004 was the direct cause of his massive pulmonary thromboemboli and his resulting death."  Dr. Matuschak explained that DVT of the lower extremities was "the direct and sole cause of the pulmonary thrombosis," and that "[r]ecently, and to an increasing extent, the relative immobilization of the lower extremities associated with prolonged air travel has been postulated as a risk factor for the development of [DVT] (so called 'traveler's thrombosis') along with consequent fatal pulmonary embolism."   Dr. Matuschak continued that pre-existing factors, such as previous incidents of DVT or recent surgery, "most likely" increase the frequency and severity of air-induced DVT and fatal results, but that a review of Mr. McAuley's records indicated no such identifiable medical conditions.  Dr. Matuschak noted that it was "theoretically possible" that there were certain genetic causes that amplified Mr. McAuley's risk of DVT, but there would have been no reason to test him for such risks.  In sum, Dr. Matuschak concluded that Mr. McAuley's DVT "most likely" developed during his flight from Ireland.  (Pls. Ex. 8.)

Plaintiffs also submitted a February/March 2005 article entitled, "Air Travel-Related Venous Thromboembolism."  This article describes various studies that had been

conducted based upon the general consensus of scientists and airline companies that an association "probably exists" between air travel and DVT.  The authors described a study which divided the risk factors into patient-related risk factors and which "speculated on the role of cabin-related risk factors: immobilization, 'coach position,' relative hypoxia [lack of oxygen], low humidity, insufficient fluid intake, and the diuretic effect of alcohol."  The authors described their survey study which had not yet been completed.  (Pls. Ex. 14).

In their administrative appeal, Plaintiffs argued that Federal's application of the "Disease or Illness" exclusion was "entirely unreasonable."  Plaintiffs pointed to federal ERISA case law holding that such an exclusion applied to pre-existing conditions which substantially contributed to the insured's injury.  Plaintiffs argued that here the exclusion did not apply because the medical opinions submitted by Plaintiffs "rule out any pre-existing" disease, illness, or bodily malfunction as a causal factor in Mr. McAuley's death.  Plaintiffs continued that this exclusion was not applicable where a covered hazard, in this case, business travel, "produced the disease, illness or bodily malfunction upon which the insurer wished to exclude coverage."  Id.

Plaintiffs also argued that Mr. McAuley's death was accidental because "there can be no dispute that the stasis which caused the DVT was caused by the airline flight," and the flight taken for business purposes was a covered hazard.  In a short paragraph,  Plaintiffs argued that Mr. McAuley's death was covered under the extension of coverage for "unavoidable exposure to elements arising from a covered Hazard," as follows:  "An airline flight required by Mr. McAuley's business is obviously a covered hazard.  Thus, if anything,

the Policies' meaning of accident or accidental is expanded by reference to the 'Extension of Coverage' language." Id.

Plaintiffs urged Federal to abandon its "accidental means" analysis and, citing to Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077 (1st Cir. 1990), to adopt an "expectation analysis," which, according to Plaintiffs, considered whether a reasonable person in the insured's position would have objectively expected the insurable loss (i.e., death) to have occurred as a result of his intentional conduct. Id.

By letter from Federal dated October 18, 2005, Plaintiffs were informed that upon independent review by an appeals committee, Federal reaffirmed the denial of benefits. The letter stated that the appeals committee reached its decision after considering the claim for benefits from "accidental means," "accidental results," and "expectation analysis" perspectives. Federal posited that the correct question under the expectation analysis was whether Mr. McAuley had an expectation that any injury or death he suffered would be covered under the policies, a question to which the answer was clearly no. Federal also reaffirmed its position that the pulmonary thrombosis that caused Mr. McAuley's death was a bodily malfunction, and as such, his death was excluded from coverage. (Pls. Ex. 7.) This lawsuit ensued.

**Arguments of the Parties**

The parties disagree as to the standard of review this Court is to apply in reviewing the denial of benefits. Defendants argue that an abuse-of-discretion standard applies because the "Interpretation of the Plan" section of the Eligibility SPD quoted above gave

Federal discretionary authority to make benefits determinations.  Plaintiffs argue that de novo review is required because the insurance policies themselves did not delegate discretionary decision-making authority to Federal.  Plaintiffs argue alternatively, that even if in general, decision-making authority may be delegated in an SPD, here the Eligibility SPD was deficient for this purpose because there is no evidence that Anheuser-Busch ever delegated such authority to Federal, as the two policies named other entities as the claims administrators.  Lastly, Plaintiffs argue that the last sentence of the authority-granting language in the Eligibility SPD ("In determining the right of any covered person to a benefit for which the plan purchases insurance, such as life insurance, the insurance company, rather than the company, will make final benefit determinations") is too "amorphous" to convey discretion to Federal.  (Pls. Sum. J. Memo, Doc. #60, at 10-18.)

Both parties contend, alternatively, that under either standard, they are entitled to summary judgment.

Plaintiffs next argue that reading various portions of each policy together results in the conclusion that Mr. McAuley's death was a covered loss.  Plaintiffs' argument goes as follows: The policies state under Extensions of Coverage that "Accident includes unavoidable exposure to elements arising from a covered Hazard."  The policies define "Hazard" as "all circumstances to which the Insured Person may be exposed."  Interposing the phrase "[which includes] unavoidable exposure to elements arising from a covered Hazard" after the word "accident" in the general coverage clauses, and substituting the phrase "all circumstances to which the insured Person may be exposed" for the phrase "a

covered Hazard," results in the following version of the coverage clauses:

> We will pay the applicable **Benefit Amount** if an accident which includes unavoidable exposure to elements arising from all circumstances to which the insured Person may be exposed results in a **Loss** [defined as including the Accidental Loss of life] not otherwise excluded.

Plaintiffs argue that under this "extraordinarily broad" policy language, "the loss covered, therefore, is a loss caused by the exposure itself, not necessarily from a separate accident that results in exposure." Id. at 20-21. Plaintiffs continue that Mr. McAuley's death is covered under this reading of the policies because his DVT, and hence his death, "resulted from his exposure to the conditions he encountered on his extended airline flight." According to Plaintiffs, these conditions were the cabin-related DVT risk factors mentioned in the article submitted to Federal on administrative appeal -- immobilization, coach position, relative hypoxia, and low humidity. Plaintiffs state that "[t]hese conditions, to which [Mr.] McAuley was necessarily and unavoidably exposed, unexpectedly caused blood clots to form in his leg(s), migrate to his lungs, and kill him within hours after the flight." Id. at 21.

Plaintiffs maintain that Defendants' litigation position that "unavoidable exposure to elements" as used in the policies refers to exposure to weather conditions "ignores the very reasonable interpretation offered by Plaintiffs." Plaintiffs further argue that Federal's interpretation of "unavoidable exposure to elements" was offered for the first time in support of Federal's motion to dismiss, rather than in the administrative process, and thus should be disregarded by the Court as a post hoc rationalization. Id. at 21-22.

Plaintiffs next argue that to the extent that Federal's denial of benefits relies on a distinction between coverage for "death by accidental means" and coverage for "accidental death," the latter applies here because that is the term used in the SPDs related to the two policies. Furthermore, according to Plaintiffs, such a distinction has been rejected in the ERISA context, and this Court should not look to non-ERISA cases, such as cases under the Warsaw Convention, which purportedly rely on this distinction to hold air carriers liable for death or bodily injury suffered by a passenger "if the accident which caused the damage so sustained took place on board the aircraft . . .," as provided in Article 17 of that Convention. Id. at 22-26.

Plaintiffs next expand upon the argument based on Wickman, 908 F.2d 1077, that they had presented to the appeals committee. Plaintiffs argue that the prevailing federal common law of ERISA rejects the distinction erected by Defendants between "death by an accidental means" and "accidental death." Plaintiffs quote Wickman as setting forth the following test for determining whether a death was "accidental" when an ERISA policy does not define that term: a death is accidental if "the insured [subjectively] did not expect an injury similar in type or kind to that suffered," but not if "a reasonable person, with the background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." Wickman, 980 F.2d at 1088-89 (death from a 40-50 foot fall from a bridge was not accidental where insured climbed over guardrail and suspended himself by hanging onto guardrail with one hand; "a reasonable person . . . would have viewed the injury as highly likely to occur as a result of

the insured's intentional conduct").

Plaintiffs cite to ERISA cases that have adopted this approach -- cases involving autoerotic asphyxiation, voluntary ingestion of a lethal amount of pain medication, and driving while intoxicated. Plaintiffs assert that the Eighth Circuit adopted the Wickman test in King v. Hartford Life & Accident Ins. Co., 414 F.3d 994 (8th Cir. 2005), a case involving an intoxicated motorcyclist who died after veering off the road and crashing. Id. at 997. Plaintiffs argue that under this test, Mr. McAuley's death was accidental because it can fairly be assumed that he did not subjectively believe that his international flight would kill him, and this expectation was reasonable. Pls. Sum. J. Memo at 27-32.

Plaintiffs next argue that Federal's interpretation of the policies' coverage language to require "death by accidental means" instead of merely "accidental death" is inconsistent with the goals of the plan. Plaintiffs point to the statement in the SPD related to the Business Travel Accident Policy (Policy B) that the policy was "designed to provide benefits to you or your beneficiary when you are injured while traveling on company business." They then assert that "there can be no meaningful dispute in this case that Mr. McAuley died from an injury he sustained while traveling on business for [Anheuser-Busch] that was caused directly by his travel." Id. at 32-33.

Plaintiffs offer several arguments as to why the exclusion from coverage for death caused by disease or bodily malfunction is not applicable to this case. First, they contend that Federal cannot rely on the "bodily malfunction" term of this exclusion because this term is not contained in either relevant SPD. Id. at 35-39. Plaintiffs also maintain that by relying

18

on this exclusion, Federal has improperly imported the requirement of an "unforeseen external event" into the analysis of whether a bodily malfunction instead of an accident caused death. They argue that application of this exclusion to deny coverage ignores the "unanimous medical opinions in this case that Mr. McAuley's death was caused by his extended flight and was not caused by or contributed to by *any* other risk factor." Id. at 41.

Plaintiffs continue that Federal's reliance on the disease, illness, or bodily malfunction exclusion renders the policies internally inconsistent by rendering meaningless the extension of coverage for "unavoidable exposure to elements." Plaintiffs assert that under this extension, "exposure to circumstances that cause death are explicitly included within the policies' definitions of accident." Id. at 41-42. Plaintiffs attempt to distinguish pulmonary embolism cases relied upon by Federal,[6] and they cite to other cases, most notably, Paulissen v. United States Life Ins. Co., 205 F. Supp. 2d 1120 (C.D. Ca. 2002) (a non-ERISA insurance case holding that insured's death while trekking through the mountains, due to high-altitude pulmonary edema was an "accidental death," and was not an excluded sickness or disease, in light of facts that the insured's condition was temporary, the disorder "did not arise from some organic cause," and the hiker would have been cured without medical attention if he had simply gone to a lower elevation), which they believe

_____

[6] E.g., Schar v. Hartford Life Ins. Co., 242 F. Supp. 2d 708, 717-18 (N.D. Cal. 2003) (non-ERISA case decided under California law and holding that death due to pulmonary embolism two weeks after surgery was a sickness or disease instead of an accident because surgery "was not an unforeseen external event"); Fegan v. State Mut. Life Assurance Co., 945 F. Supp. 396 (D. N.H. 1996) (holding that death due to pulmonary embolism as the result of an accidental knee injury was covered under accidental death policy).

supports their position that Mr. McAuley's death as a result of pulmonary embolism was an accident and was not the result of a disease, illness, or bodily malfunction within the meaning of the policies.  Id. at 43-47.

Defendants argue that although Mr. McAuley's death may have been sudden and unexpected, it was not the consequence of an accident, as required by the language of the policies' coverage clauses.  Defendants cite to several cases including Air France v. Saks, 470 U.S. 392 (1985), brought under Article 17 of the Warsaw Convention, which, as noted above, makes air carriers liable for death or bodily injury suffered by a passenger "if the accident which caused the damage so sustained" took place on board the aircraft.  The plaintiff in Air France felt severe pressure in one ear as the jetliner she was aboard landed. Shortly thereafter she was diagnosed with permanent hearing loss in that ear.  The Supreme Court ruled that liability for an accident under Article 17 arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger, and that "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident . . . ."  Id. at 405-06.

Defendants argue that Mr. McAuley's body "simply reacted in a particular negative manner to a wholly voluntary, ordinary and unexceptional event -- an international air flight," and that thus, his death was not caused by an accident but was an "unfortunate unforeseen result of a normal occurrence."  Defendants note that it is undisputed that nothing "by way of an 'accident' (meaning anything fortuitous, unexpected, unusual . . .)

happened on the flight to cause Mr. McAuley to develop the blood clots." Defendants further argue that Mr. McAuley's death resulted from a disease or bodily malfunction, and as such, coverage was specifically excluded under the policies.

In response to Plaintiffs' argument based upon the "unavoidable exposure to elements" extension, Defendants argue that the term "elements" in this context refers to severe weather conditions, and that having to sit during a long air flight does not constitute "unavoidable exposure to elements." Furthermore, Defendants argue, Mr. McAuley's exposure to stasis and/or low fluid intake was not "unavoidable," and there is no evidence that the cabin pressure and humidity (exposure to which was unavoidable) was the cause of Mr. McAuley's DVT. Defendants add that in explaining why it denied benefits, Federal was not required to discuss this particular argument, and that Federal's response now to Plaintiffs' expanded argument on the matter is not a forbidden post hoc rationalization. Defendants note that in both denial letters (June 3, 2005, and October 18, 2005), Federal expressly stated that it did not believe that Mr. McAuley had suffered an "accident" that was caused by an accident as required by the policies' language, and that this inferentially encompassed a rejection of Plaintiffs' exposure-clause argument. In any event, continue Defendants, under a de novo standard of review, Federal's failure directly to address this matter at the administrative level is inconsequential. Defendants further argue that the Wickman test is inapplicable here because the plain language of the policies' coverage clauses requires that an accidental loss be the result of an accident.

## DISCUSSION

### ERISA Requirements

ERISA benefits plans must be established pursuant to a written instrument. 29 U.S.C. § 1102(a)(1). ERISA also mandates that a written SPD be distributed to plan participants to inform them of their rights and obligations under the plan. Id. § 1022(a)(1). The SPD must be written in a manner calculated to be understood by the average plan participant and must be sufficiently accurate and comprehensive to apprise participants and beneficiaries of their rights and obligations under the plan. Id. at § 1022(a). The SPD must include certain information including the name and address of the employer and of the administrator of the plan, the plan's eligibility requirements, and "the circumstances which may result in disqualification, ineligibility or denial or loss of benefits." Id. § 1022(b); 29 C.F.R. § 2520.102-3.

ERISA requires that "[a] summary of any material modification in the terms of the plan . . . shall be written in a manner calculated to be understood by the average plan participant and shall be furnished" to "participants and beneficiaries not later than 60 days after the date of the adoption of the modification or change." 29 U.S.C. §§ 1022(a), 1024(b)(1).

### Summary Judgment Standard

A district court's grant of judgment on an administrative record in an ERISA benefits case is a form of summary judgment. Menz v. Procter & Gamble Health Care Plan, 520 F.3d 865 (8th Cir. 2008). A grant of summary judgment is proper if the evidence,

viewed in the light most favorable to the nonmoving party, demonstrates there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Jones v. Mountaire Corp. Long Term Disability Plan, 542 F.3d 234, 239 (8th Cir. 2008).  Here the parties have filed cross motions for summary judgment, both asserting that judgment may be entered on the current record.

**ERISA Standard of Review**

ERISA provides that a plan participant may bring a civil action to "recover benefits due to him under the terms of his plan" and "to enforce his rights under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B).  But ERISA does not specify what standard of review courts are to apply.  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Id. at 115.  Where such discretionary authority is granted, an abuse-of-discretion standard applies.  Id.; Menz, 520 F.3d at 869.[7]

In the Eighth Circuit, "the common law rule of construction that ambiguous language in an insurance policy is construed against the insurer has no place in the construction of an ERISA plan."  Bernards v. United of Omaha Life Ins. Co., 987 F.2d 486, 488 n.1 (8th Cir. 1993) (per curiam) (case involving deferential standard of review) (citing

---

[7]    In Jackson v. Prudential Ins. Co. of America, 530 F.3d 696, 701 n.6 (8th Cir. 2008), the Eighth Circuit explained that in this context, the terms "abuse of discretion" and "arbitrary and capricious" are interchangeable.

<u>Finley v. Spec. Agents Mut. Ben. Ass'n, Inc.</u>, 957 F.2d 617, 619 (8th Cir. 1992).[8]

Here, Plaintiffs assert that de novo review of Federal's denial of benefits is warranted, with no deference accorded the administrative decision, because the insurance policies themselves do not provide for any level of discretion on the part of the plan administrator to interpret the plan. Plaintiffs contend that the Court may not rely upon the Eligibility SPD for the grant of such authority. They further argue that even if the Eligibility SPD were relevant, the discretion-granting language therein, as quoted above, does not specifically refer to Federal and is confusing.

There is a split in the circuits as to whether a grant of discretion contained in an SPD, where the insurance policy itself is silent on the matter, triggers the abuse-of-discretion standard of review of decisions denying benefits under the terms of the policy. <u>Compare</u> <u>Schwartz v. Prudential Ins. Co. of Am.</u>, 450 F.3d 697, 698 (7th Cir. 2006) (holding that de novo review applies when discretion-granting language is set forth in an SPD and not in the underlying policy) <u>with</u> <u>Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.</u>, 440 F.3d 571, 576 & n.7 (2d Cir. 2006) (holding that abuse-of-discretion standard applies when an SPD contains an express grant of discretion, even though the policy is silent on the matter), <u>and</u> <u>Curran v. Kemper Nat'l Servs., Inc.</u>, 2005 WL 894840, at *5 (11th Cir. 2005) (same; explaining that ERISA contemplates that an employer's benefit plan consists of multiple

---

[8]    Other panel decisions in the Eighth Circuit stated this principle in less absolute terms. <u>See, e.g.</u>, <u>Bond v. Cerner Corp.</u>, 309 F.3d 1064, 1068 (8th Cir. 2002) (stating in case applying de novo review that "any ambiguities should be construed against the drafter only as a last step"). This Court does not believe that the present case is a "last step" case.

documents including the mandatory SPD).[9]

Although the Eighth Circuit has never directly addressed this issue, in  McKeehan v. Cigna Life Ins. Co., 344 F.3d 789 (8th Cir. 2003), when considering whether certain language in a policy granted the administrator discretion, the Court stated as follows: "We require 'explicit discretion-granting language' in the policy *or in other plan documents* to trigger the ERISA deferential standard of review."  Id. at 793 (emphasis added) (citation omitted).  More recently, in Rittenhouse v. UnitedHealth Group Long Term Disability Insurance Plan, 476 F.3d 626 (8th Cir. 2007), in holding that certain language in an SPD was too amorphous to constitute a clear grant of decision-making authority, the Eighth Circuit assumed that proper language in the SPD would have triggered the deferential standard of review.  The appellate court then went on to consider whether certain language in the insurance policy itself conferred discretionary authority, stating that "the policy and the [SPD] jointly constitute the Plan documents."  476 F.3d at 629.

In numerous cases in which the specific issue at hand was not raised, the Eighth Circuit Court of Appeals and district courts in the Circuit have relied upon language in an SPD to hold that the abuse-of-discretion standard applied.  See, e.g., Jackson, 530 F.3d at 701; Parkman v. Prudential Ins. Co. of Am., 439 F.3d 767, 772 (8th Cir. 2006); Birdsell v. UPS of Am., Inc., 94 F.3d 1130, 1133 n.2 (8th Cir. 1996); Porte v. Long-Term Disability

_____

[9]     The Court notes that in Curran, the Eleventh Circuit clarified that its earlier decision in Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276 (11th Cir. 2003), a case cited for support by the Seventh Circuit in Schwartz, 450 F.3d at 698, did not stand for the proposition that courts could not look to SPDs for a grant of discretionary authority. Curran, 2005 WL 894840, at *4-5.

25

Plan of May Dep't Stores Co., No. 4:07CV922 JCH, 2008 WL 250344, at *1 (E.D. Mo. Jan. 29, 2008).[10]

This Court is persuaded by the case law of those circuits which hold that when the policy in question is silent on the matter, discretion-granting language in an SPD triggers the abuse-of-discretion standard. Firestone stated that the "benefit plan" must contain discretion-granting language for the abuse-of-discretion standard to apply, and an SPD, required by ERISA, is part of a benefit plan. See Ross v. Rail Car Am. Group Disability Income Plan, 285 F.3d 735, 739 n.5 (8th Cir. 2002) ("both the SPD and the [long-term disability] policy constitute the Plan"); Jensen v. SIPCO, Inc., 38 F.3d 945, 949 (8th Cir. 1994) ("SPDs are considered part of the ERISA plan documents."). Further, here, as noted above, the Eligibility SPD specifically stated that it served "as one of the official plan documents." (Pls. Ex. 3 at 1.)

In Baxter v. Briar Cliff Coll. Group Ins. Plan, 409 F. Supp. 2d 1108 (N.D. Iowa 2006), a case in which it appears that the grant of discretion appeared only in the SPD, the district court analyzed the issue and reasoned that based on Ross and Jensen, the grant of discretion to trigger a deferential review of the denial of benefits could be in an SPD. Baxter, 409 F. Supp. 2d at 1124-35. This Court finds this reasoning to be sound.

Courts that have held that the grant of discretion must be in the policy itself reason that giving effect to discretion-granting language in an SPD when no such language is

---

[10]    While this Court does not rely upon an inference that had there been discretion-granting language in the policies themselves in these cases, the courts would have so noted, this does seem like a fair inference.

included in the policy would broaden the terms of the policy, contrary to the purpose of an

SPD.  See Schwartz, 450 F.3d at 699-700; Paulson v. Paul Revere Life Ins. Co., 323 F.

Supp. 2d 919, 940 (S.D. Iowa 2004).  But this is not so.  The terms of the policy are not

altered by the grant of discretion in an SPD to an administrator to interpret those terms.

The Court also finds unpersuasive Plaintiffs' second argument with regard to the

standard of review.  Plaintiffs argue that the above-quoted section of the Eligibility SPD

("Interpretation of the Plan") is confusing; and while it allows Anheuser-Busch to delegate

its discretion to a "claims administrator," entities other than Federal were designated in the

two policies as the claims administrators, and there is no evidence that Anheuser-Busch ever

delegated decision-making discretion to Federal by means of a separate agreement.

According to Plaintiffs, the language in the SPD that insurance companies (such as Federal)

"will make final benefit determinations" in determining the right of a covered person to

benefits under a policy purchased from those companies, is too "amorphous" to trigger the

abuse-of-discretion standard with regard to those determinations.  (Pls. Memo at 14-18.)

The Court believes that the language in question here sufficiently delegates

Anheuser-Busch's discretionary authority to Federal.  See Butts v. Continental Cas. Co.,

357 F.3d 835 (8th Cir. 2004) (holding that the plan need not spell out in detail who has the

discretion, other than to specify that those charged with implementing it will have such

discretion); Baxter, 409 F. Supp. 2d at 1123-24 (finding that statement in SPD, "The

Administrator and other Plan fiduciaries have discretionary authority to interpret the terms

of the Plan and to determine eligibility for and entitlement to benefits in accordance with the

Plan," conferred discretion on insurance company which had provided the policy in question); Constantino v. Washington Post Multi-Option Benefits Plan, 404 F. Supp. 2d 31, 39 (D.D.C. 2005) (rejecting argument that abuse-of-discretion standard did not apply because plan documents did not provide express procedure for the employer to delegate its discretionary power to the insurance company which issued the policy in question).

In McKeehan, relied upon by Plaintiffs, the long-term disability plan at issue granted the plan sponsor (plaintiff's employer) "full and exclusive authority to control and manage the Plan, to administer claims, and to interpret the Plan and resolve all questions arising in the administration, interpretation, and application of the plan." 344 F.3d at 792. The Plan also provided that the sponsor "may contract with an independent third party to administer the Plan and process claims under the Plan." Id. The plaintiff's employer contracted with an insurance company to perform strictly ministerial functions in administering claims.

While the plaintiff's claim for benefits was under review, the employer underwent a change of ownership and the third-party administrator was replaced by another insurance company which allegedly had the discretionary authority to deny claims. Id. But there was no documentation of the agreement between the new owner and the new insurance company/administrator. Because the record established that the second insurance company's "function in the processing of claims was materially different than the function previously performed by [the first insurance company]," which lacked decision-making discretion, the Eighth Circuit held that the new plan administrator's decision to deny

benefits was subject to de novo review.  Id. at 792-3.

Here, there was no such change in ownership and Plaintiffs do not argue that Federal or its predecessors (i.e., National and AIG), in fact, lacked decision-making discretion.  Thus, McKeehan is inapplicable to this case.  The Court believes that the failure to change the SPDs to name Federal as the claims administrator was harmless error in connection with the question of the standard of review.  Cf. Greeley v. Fairview Health Servs., 479 F.3d 612, 614 (8th Cir. 2007) (holding that in order to recover benefits under a faulty SPD, a plan participant must show that he or she "was likely to have been harmed as a result of a deficient SPD"; and employer may rebut this showing "through evidence that the deficient SPD was in effect a harmless error").

Furthermore, the Court believes that the statement in the Eligibility SPD that "[i]n determining the right of any covered person to a benefit for which the plan purchases insurance, such as life insurance, the insurance company, rather than the company, will make final benefit determinations," is a sufficient grant of discretionary authority to Federal to invoke the abuse-of-discretion standard of review.  That is especially so where, as here, that language immediately follows a broad grant of discretion to the company.  See Finley, 957 F.2d at 619-20 (holding that the provision that insured was entitled to an accidental death benefit increase if certain conditions were met "as determined by" the designated decision maker invoked the discretionary standard of review).

Plaintiffs' reliance on Walke v. Group Long Term Disability Ins., 256 F.3d 835 (8th Cir. 2001), and similar cases, is misplaced.  The language at issue in Walke provided

that the ERISA plan would pay benefits if the insured "submits satisfactory proof of Total Disability to us."  256 F.3d at 839-40.  Similarly, in <u>Rittenhouse</u>, 476 F.3d at 629, the Eighth Circuit held that the statement in an SPD that long-term disability benefits will be paid when "we [AIG] determine that proof of your LTD claim is satisfactory" did not constitute discretion-conferring language.  Such statements are not comparable to the statement at issue here that first grants broad discretion to the company and then, in defined circumstances, substitutes the insurance carrier for the company and provides that in those cases the insurance carrier will make final benefit determinations.

In sum, the Court concludes that the abuse-of-discretion standard applies to this case.  The Court will nevertheless consider Federal's decision denying benefits, under both standards of review.

**<u>Did Federal Abuse its Discretion in Denying Benefits?</u>**

1. **<u>Standard of Review</u>**

"Under the abuse of discretion standard, a Plan administrator's interpretation will stand so long as it is reasonable."  <u>Erven v. Blandin Paper Co.</u>, 473 F.3d 903, 906 (8th Cir. 2007) (citing <u>King v. Hartford Life & Acc. Ins. Co.</u>, 414 F.3d 994, 999 (8th Cir. 2005) (en banc)).  In determining whether an administrator's interpretation of the plan is reasonable, courts should consider "whether it is inconsistent with the Plan's goals, whether it renders language of the plan meaningless, superfluous, or internally inconsistent, whether it conflicts with the substantive or procedural requirements of ERISA, whether it is inconsistent with prior interpretations of the same words, and whether it is contrary to the Plan's clear

language." Id. (citing Finley, 957 F.2d at 621).

Where a plan contains uncertain terms, a court should not disturb the plan administrator's interpretation of the plan terms, as long as it is reasonable. Riddell v. Unum Life Ins. Co. of Am., 457 F.3d 861, 864 (8th Cir. 2006). As stated in King, 414 F.3d 994 at 999:

> These so-called Finley factors inform our analysis, but the dispositive principle remains that where plan fiduciaries have offered a 'reasonable interpretation' of disputed provisions, courts may not replace it with an interpretation of their own – and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination. Thus, while a court may develop the "federal common law" of ERISA to interpret a benefit plan in a case governed by de novo review, an administrator with discretion under a plan to construe uncertain terms is not bound by this same interpretation, so long as the administrator adopts an interpretation that is "reasonable."

King, 414 F.3d at 999 (citations and internal quotes omitted).

The test for reasonableness ultimately depends upon the administrator's basis for denial. Therefore, in order for this Court to determine whether the administrative decision was proper, the Court must view the administrative record and rationale, and "may not admit new evidence or consider post hoc rationales." Conley v. Pitney Bowes, 176 F.3d 1044, 1049 (8th Cir. 1999).

In Firestone, the Supreme Court held that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115. The Supreme Court recently clarified the law regarding the conflict of interest that arises when, as here, a claims administrator and an insurer of a plan are the same entity.

In Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008), the Supreme Court held that an

entity that is both the claims administrator and payor of benefits has a conflict of interest.

Id. at 2348.

The Supreme Court stated that this conflict does not change the standard of review

from deferential to less deferential, but rather that the conflict was "but one factor among

many" for the reviewing court to balance, with any one factor acting "as a tiebreaker when

the other factors are closely balanced." Id. at 2351; see also Hackett v. Standard Ins. Co.,

___ F.3d ___, 2009 WL 703235, at *5 (8th Cir. 2009); Wakkinen v. UNUM Life Ins. Co. of

Am., 531 F.3d 575, 581-82 (8th Cir. 2008). The conflict of interest is "more important

(perhaps of great importance) where circumstances suggest a higher likelihood that it

affected the benefits decision, including, but not limited to, cases where an insurance

company administrator has a history of biased claims administration." Glenn, 128 S. Ct. at

2351. Here, Plaintiffs have not raised any circumstances suggesting a likelihood that

Federal's conflict of interest as the claims administrator and insurer affected its decision to

deny benefits, or offered any evidence suggesting factors such as a history of biased claims

administration. They also have not asserted any procedural irregularities, and none appear

from the record. On the other hand, the record does not reflect "active steps taken by the

administrator to reduce bias and to promote accuracy." See Id.[11] As such, the Court will

---

[11]     The Court notes that the parties filed their briefs prior to the decision in
Glenn, however, neither party requested further briefing or the need to supplement the
record following that decision. Furthermore, the parties conducted discovery on this
issue and even pre-Glenn, the Eighth Circuit recognized that an entity serving as both
insurer and administrator of an ERISA plan was "palpable evidence of a conflict of

consider Federal's conflict of interest as a factor, according it neither more nor less than normal weight. See Smith v. Health Servs. of Coshocton, No. 08-3620, 2009 WL 481603, at *5 (6th Cir. Feb. 25, 2009).

### 2. Language of the Coverage Clauses

Plaintiffs assert that Federal's interpretation of "accident" ignores the plain language of the policies, contradicts the language of the SPDs, is inconsistent with the plan goals, and is contrary to the federal common law of ERISA. Plaintiffs' arguments, however, are not well taken.

Beginning first with the language of the policies themselves, Defendants maintain, and Federal has continuously maintained, that the plain language of the coverage clauses in the insurance policies requires that (i) an "accident" (ii) result in (iii) the accidental loss of life, for benefits to be paid. Federal's position that the policy requires that an accident (and not an otherwise uneventful plane flight) be the cause of any unexpected death appears to be supported by the policy language.

The reasonableness of this interpretation at the administrative level is supported by the decision in Air France. The distinctions noted by Plaintiffs between Air France and the present case -- namely that Air France is not an ERISA case, does not involve an insurance policy, and involves different language than that in the policies here -- may dictate that Air France is not controlling, but the Supreme Court's reasoning and analysis is very instructive

interest." See Torres v. UNUM Life Ins. Co. of Am., 405 F.3d 670, 678 (8th Cir. 2005) (citing cases).

on the underlying question of what constitutes an accident/accidental death.

Further support for Defendants' position is provided by a more recent Supreme Court case decided under Article 17 of the Warsaw Convention, <u>Olympic Airways v. Husain</u>, 540 U.S. 644 (2004). The passenger in that case died from an asthma attack during an airplane flight in which he was seated three rows in front of the smoking section. A flight attendant had three times refused to assist him in moving his seat. The Court held that the flight attendant's conduct constituted an "accident" under Article 17. The Court held that for purposes of the "accident inquiry," a plaintiff "need only be able to prove that some link in the chain was an unusual or unexpected event external to the passenger.'" <u>Id.</u> at 652-54. Had the plaintiff not encountered the unusual stewardess, his death would not have been an accidental death or caused by an accident. Here, Plaintiffs have never posited any unusual or unexpected event external to the decedent.

In <u>Blotteaux v. Qantas Airways, Ltd.</u>, 171 Fed. Appx. 566 (9th Cir. 2006), the court was faced with facts essentially identical to those in the present case. As here, the plaintiff suffered a pulmonary embolism resulting from DVT occurring on an international flight on which nothing out of the ordinary occurred. The court held, on summary judgment, that the passenger's development of DVT failed to qualify as an "accident" that was compensable under Article 17 of the Warsaw Convention. The court explained as follows:

> It is undisputed that the flight in question was uneventful, with no
> equipment malfunction or other anomaly occurring. . . . The susceptibility
> of airline passengers to development of DVT, particularly on long flights is
> well recognized. . . . No evidence has been presented that anything unusual
> occurred aboard the Quantas flight in question, or that [the plaintiff's]
> development of DVT was triggered by anything other than his own internal

reaction to the prolonged sitting/inactivity attendant to any lengthy flight

Id. at 568-69.

The court distinguished <u>Olympic Airways</u> on the factual basis that in that case, the flight attendant had repeatedly refused to move the passenger, an event which the Supreme Court held was so unusual and unexpected as to satisfy the "accident" requirement of Article 17.  <u>Id.</u> at 569; <u>see also</u> <u>Rodrigez v. Air New Zealand</u>, 383 F.3d 914, 916-19 (9th Cir. 2004) (holding that the development of DVT on a long flight was not an "accident" under Article 17); <u>accord</u> <u>Caman v. Continental Airlines, Inc.</u>, 455 F.3d 1087, 1089-91 (9th Cir. 2006); <u>Blansett v. Contintental Airlines, Inc.</u>, 397 F.3d 177, 181 (5th Cir. 2004).  This Court finds this reasoning to be lucid and reasonable on the question of what constitutes an "accident."  The fact that this reasoning was presented in a Warsaw Convention case does not make it any less cogent when applied to the present case to determine whether Federal's denial of benefits was reasonable.  If there were a contrary body of ERISA law dealing with deaths from DVT following long flights, such authority would govern here, but Plaintiffs have not cited, nor has the Court found such a body of ERISA case law.

The word "accident" is disarmingly difficult to define.  In <u>Olympic Airways</u>, the Supreme Court identified several factors that constitute an accident: an event which is unusual, unexpected, and external to the passenger.  540 U.S. at 652.  Here, there was no unusual, unexpected event external to Mr. McAuley.  The concept of chance is also associated with the term accident.  See Black's Law Dictionary 15 (6th ed. 1990).  A strong argument can be made, though, that the "chance" to which Dr. Lynch referred in his letter,

i.e., the doctors do not know why, is not the same chance or randomness that characterizes an accident.[12]

Paulissen, 205 F. Supp. 2d 1120, relied upon by Plaintiffs, does not provide persuasive authority for finding Federal's interpretation of the policy to be unreasonable. Relying on California case law, the district court in Paulissen determined that the particular language at issue was ambiguous, requiring that it be construed against the insurer. According to the court, for the insured to prevail, all that was required was a showing that the insured's death was unexpected. Paulissen, 205 F. Supp. 2d at 1128. Here, the plain language of the policy supports Defendant's interpretation, and as noted above, the Eighth Circuit does not employ the practice of construing unclear language in an insurance policy against the insurer in ERISA cases.

### 3. "Unavoidable Exposure to Elements" Extension of Coverage

Nor is Federal's interpretation unreasonable in light of the extension clause. Plaintiffs argue that an "accident" under the policies includes unavoidable exposure to elements arising from all circumstances to which the insured may be exposed when traveling on business, and that "elements" includes matters such as airline cabin pressure and humidity. The Court notes, however, that in their claim letters, Plaintiffs did not reference

---

[12]     Arguably there is a medical scientific reason why Mr. McAuley developed DVT, the cause of which has not yet been discovered, such that it was not "by chance alone" that it happened to Mr. McAuley. According to Dr. Lynch, the chance (or risk) for DVT associated with stasis from prolonged air travel has been quantified and is a "widely recognized risk factor." (Pls. Ex. 9.) The fact that medical science does not yet know why some individuals develop DVT associated with extended air flights may make that occurrence unpredictable, but not necessarily random or accidental.

either air pressure or humidity; they contended that "stasis or immobility" was the cause.  In their March 1, 2005 letter to Federal, Plaintiffs argued, "The stasis or immobility that causes such DVT is an unavoidable exposure of long air flight in that passengers <u>must</u> for the vast majority of such flight time, remain in their seats."  (Pls. Ex. 13 at 3-4.)  Later, in the "Conclusion," they again referenced "the formation of the emboli as a result of the stasis caused by the long flight."  <u>Id.</u>  Again in their appeal, Plaintiffs asserted "there can be no dispute that the stasis which caused the DVT was caused by the airline flight."  (Pls. Ex. 14 at 4.)

In its response, Federal did not expressly reference the "Elements" language, asserting more generally that there was no "accident" within the meaning of the policy and that the death was the result either of "natural causes, disease, physical illness, bodily malfunction, or a combination of thereof."  Further, Federal asserted that "it was not an accident that Mr. McAuley embarked on a flight and placed himself in a situation where he would be at risk of sustaining a DVT (i.e. confinement on a plane for a long period of time)."  (Pls. Ex. 6.)  In response to the appeal, Federal again asserted, among other arguments, its position that the airline flight was not an "accident" within the meaning of the policy.  (Pls. Ex. 7.)  Federal further asserted that "under the positions you urge, the Policies would be the equivalent of 'life insurance', which we do not believe is in any sense a reasonable expectation that Mr. McAuley could have had," citing to a case for the proposition that "relying on forseeability would mean that any sudden death from natural causes must then be considered an accident."  <u>Id.</u>

Based on the plain language of the policies, it was not unreasonable for Federal to conclude that the "stasis" that may result from a long flight is not an "accident" within the meaning of the policies, even under the extension clause. It is difficult to square "stasis" with any common meaning of "exposure to elements." The Court notes that the first definition of "elements," as a plural noun, in the Merriam-Webster Collegiate Dictionary (10th ed. 2002) is: "weather conditions; *especially*: violent or severe weather." Webster's New Third International Dictionary (3d ed. 2002) similarly defines elements in the plural first as "weather conditions viewed as activities of [air, water, fire and earth]; esp: violent or severe weather." Cf. Adams v. Continental Cas. Co., 364 F.3d 952, 954 & n.4 (8th Cir. 2004) (consulting Webster's definition of "aerial" in considering, on de novo review, whether an insured's death in a sports parachuting accident was within exclusion clause of an ERISA accidental death policy excluding coverage for death resulting from riding in a "device for aerial navigation"). The Court believes that it is fair to read the term "elements" in the context in which it appears, i.e., "unavoidable exposure to elements," to refer to wind, cold, sun, and the like -- not, as Plaintiffs urged, to all the conditions one encounters in an airplane cabin. In addition, this Court believes that the meaning a reasonable person would have attributed to the clause "exposure to elements" in the context of the policies here is exposure to weather conditions, not exposure to everything one is exposed to in a particular situation.

Furthermore, Plaintiffs have not presented any evidence that Mr. McAuley's "exposure" to stasis (the main acquired risk factor linking long air flights to DVT) and/or

possible insufficient fluid intake (another such acquired risk factor identified by Drs. Hyers and Matuschak and the 2005 article mentioned above) was "unavoidable." Plaintiffs nowhere have asserted, nor is there any evidence in the record, that anything, such as turbulence or intervention by an airline employee or fellow passenger, made exposure to stasis by Mr. McAuley unavoidable. It is true that by taking the flight in question, Mr. McAuley was unavoidably exposed to the air pressure and humidity in the cabin, as were all other passengers on the flight. But even if Plaintiffs can be seen to have raised this argument at the administrative level, there is no evidence in the record that these particular conditions incident to long airline flights in general or to Mr. McAuley's flight in particular caused Mr. McAuley's DVT. Indeed, Plaintiffs' three experts mentioned immobilization and dehydration as the only as yet identified DVT risk factors associated with long flights. Accordingly, the Court concludes that Plaintiffs have not met their burden of proof on this matter, under any standard of review. See Farley v. Ben. Trust Life Ins. Co., 979 F.2d 653, 658 (8th Cir. 1992) (citing 29 U.S.C. § 1132(a)(1)(B) and holding that the burden of proof was on the insured to establish that treatment was medically necessary under an ERISA health care plan); Stamp v. Met. Life Ins. Co., 531 F.3d 84, 93 (1st Cir. 2008) (stating that in an ERISA case, "the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies") (citing Couch on Insurance § 254:16 (3d ed. 2007) and cases).

Moreover, as Defendants argue, Plaintiffs' reading of "unavoidable exposure to elements" expands "accident" and/or "accidental" to include practically everything the

insured person experiences while engaged in business-related travel during the coverage period.  Cf. King, 414 F.3d at 1004) (rejecting, upon discretionary review, the plan administrator's reading of an exclusion in an ERISA accidental death policy because it was not the "most natural reading" and it rendered other policy language meaningless).[13]  The Court believes that Federal's decision to deny benefits under the coverage clauses of the policies was reasonable, even though Federal did not expressly explain why it rejected Plaintiffs' interpretation of "unavoidable exposure to elements."

The Court also rejects Plaintiffs' argument that Defendants' analysis of "unavoidable exposure to elements" (and of the Wickman test, discussed below) are impermissible post hoc rationales for denying coverage, i.e., rationales not relied upon in the administrative claim-denial process.  In King, 414 F.3d at 1003-04, the Eighth Circuit explained that in conducting an abuse-of-discretion review of a plan administrator's denial of benefits, a court should not uphold the decision based upon a ground presented in litigation that is "fundamentally inconsistent with" the administrative rationale.  This Court's analysis of the coverage clause does not depend upon Defendants' more current assertion that the term "exposure to elements" pertains to weather conditions.  But in any event, this is not a case such as King in which the plan administrator's decision denying benefits was fundamentally inconsistent with its litigation position.  At the administrative

---

[13]     The Court notes that two members of the Eighth Circuit panel which decided McAuley, 500 F.3d 784, opined in dictum in a footnote that this interpretation of the clause "exposure to the elements," "may be a reasonable, though extremely narrow reading of that clause."  500 F.3d at 788 n.4.

level, Plaintiffs identified "statis" as the cause of the DVT. Federal clearly stated its

position that Mr. McAuley did not suffer an accident that was caused by an accident, and

that an otherwise uneventful flight and stasis could not constitute an "accident" within the

meaning of the policy. It now simply explains that position more fully in response to

Plaintiffs' expanded argument as to why it does apply. Cf. Stamp v. Metro. Life Ins. Co.,

531 F.3d 84, 90-91 (1st Cir.) (holding that plan administrator's general statement that "the

weight of authority under applicable Federal law would not compel" a finding that the

decedent's death was an accident was not arbitrary and capricious because of its failure to

recite the Wickman formula), cert. denied, 128 S. Ct. 2351 (2008).

### 4.    Language of the SPDs and the Plan Goals

Nor does the Court find any conflict between Defendants' interpretation of Accident

and either the language of the SPDs or the plan goals. Plaintiffs rely on the fact that the

Blanket Accident SPD refers to benefits for "Accidental Death." (Pls. Ex. 4 at 6.)

Likewise, the Business Travel SPD provides:

> The business travel accident (BTA) insurance plan is designed to provide benefits
> to you or your beneficiary when you are injured while traveling on company
> business. Benefits are available for accidental death, dismemberment, loss of
> sight, hearing and speech.

(Pls. Ex. 5 at 6.)

This description in the SPDs is not contrary to Defendants' interpretation. The plan

document is simply more specific and detailed. See Jessup v. Alcoa, Inc., 481 F.3d 1004,

1008 (8th Cir. 2007) (finding no conflict when plan documents are more specific than SPD

language). The SPD specifically states that the SPD "is not intended to replace any other

plan documents, such as insurance contracts, which govern in the event of any conflict."

(Pls. Ex. 4 at 1.)  More importantly, page 3 of the Business Travel Accident SPD

specifically states: "BTA benefits are paid if you die . . . due to an accident that happened

while you were traveling on company business as an active employee."  This language is

wholly consistent with Defendants' interpretation.  Any conflict is created by Plaintiffs'

attempt to import the <u>Wickman</u> legal reasoning into the SPDs – not by the language of the

SPDs themselves.

      Nor is Defendants' interpretation somehow inconsistent with the plan's goals.

Plaintiffs cite to a single introductory sentence in the Business Travel Accident SPD which

states that "it is designed to provide benefits . . . when you are injured while traveling on

company business."  (Pls. Ex. 4 at 1.)  But the very next sentence specifies that such

benefits are for "accidental death, dismemberment, loss of sight, hearing and speech. . ."  <u>Id.</u>

Nothing in the language of the SPDs or plans suggests an intent to provide benefits any time

a covered employee dies unexpectedly.

      Nor does the language in the SPD serve to expand the benefits.  It is true that as a

general rule, when an SPD conflicts with the plan it purports to summarize, the SPD

provision governs.  <u>See</u> <u>Jessup</u>, 481 F.3d at 1007; <u>Jensen v. SIPCO, Inc.</u>, 38 F.3d 945, 952

(8th Cir. 1994).  But this general rule is qualified.  Specifically, "'this rule of construction

does not apply when the plan document is specific and the SPD is silent on a particular

matter.'"  <u>Koons v. Aventis Pharms., Inc.</u>, 367 F.3d 768, 775 (8th Cir. 2004) (quoting

<u>Jensen</u>, 38 F.3d at 952).

Here, the Court does not see a material difference between the SPDs and the insurance policies with regard to coverage, and the Court believes that Federal did not abuse its discretion in denying benefits under the policies as well as under the SPDs. See Jessup, 481 F.3d at 1007 (SPD's summary of eligibility criteria for "Rule of 65" retirement benefits did not conflict with retirement plan itself, although SPD and plan employed different language in summarizing eligibility; claim administrator did not abuse its discretion in concluding that employees were not eligible for those benefits under either plan or SPD definition).

Thus, applying the Finley factors, Federal's interpretation of the terms of the policies does not render language of the policies meaningless, superfluous, or internally inconsistent; does not conflict with the substantive or procedural requirements of ERISA; is not contrary to the policies' clear language; and is not inconsistent with the policies' goals of providing insurance for accidental death. Nor is there any indication that the interpretation is inconsistent with prior interpretations by Federal of the same words at issue here. Although the Court acknowledges that Federal had a conflict of interest, there is no indication that Federal's conflict of interest improperly influenced its decision, and this Court does not find the case to be so closely balanced that Federal's conflict should act as a tie breaker to dictate a finding of abuse of discretion. See Wakkinen, 531 F.3d at 582.

## 5.     The "Highly Likely to Occur" Test

The Court also concludes that the Wickman "highly likely to occur" test is not instructive in this case. In King, 414 F.3d at 1001-02, the Eighth Circuit did not definitively

43

adopt the Wickman test, as Plaintiffs argue, but rather ordered that the case be returned to

the ERISA plan administrator for reevaluation of the claim for accidental death benefits

under the administrator's most recent interpretation of the Wickman standard, which the

insurance company asserted during litigation should be applied to deny benefits. But even

assuming that in the proper case, the Eighth Circuit would adopt Wickman, the present case

is different from the Wickman line of cases.[14]

In the Wickman line of cases, the insured engaged in some affirmative conduct,

such as hanging from a bridge with one hand or driving a motorcycle while highly

intoxicated, that increased the risk of death beyond that of ordinary life; the question was to

what level that risk had been increased by the insured's actions. Here the insured took no

such action that subjected him to a risk of death beyond that of ordinary life. Rather, Mr.

McAuley took an international airline flight. As reasoned above, the fact that the

development of DVT was not highly likely to occur, especially in the case of an individual

with no known risk factors, does not render its occurrence an accident or Mr. McAuley's

death an accidental death. In any event, where, as here, the administrator has adopted a

---

[14] Besides the cases noted above as cited by Plaintiffs, see McAfee v. Transam. Occidental Life Ins. Co., 106 F. Supp. 2d 1331, 1341-42 (N.D. Ga. 2000) (where insured was shot and killed by police after fleeing arrest and brandishing weapon at officers, insured's death was not accidental under ERISA insurance policy providing benefits for "losses resulting from bodily injuries caused by an accident"; reasonable person would have known that death or serious injury was a likely result of those actions); Walker v. Metro. Life Ins. Co., 24 F. Supp. 2d 775, 781 (E.D. Mich. 1997) (insured did not "die . . . as the result of an accident," as required for coverage under an ERISA insurance policy, where death resulted from driving at twice the legal limit while intoxicated; "a reasonable person in the decedent's shoes would have known that driving while intoxicated at twice the legal limit was highly likely to result in serious injury or death").

reasonable interpretation, it is not bound by any federal common law that has developed in the area. See King, 414 F.3d at 999.

**Disease or Illness Exclusion**

Although in light of the above it is unnecessary for the Court to reach this matter, the Court also finds that it was reasonable for Federal to conclude that coverage was excluded by the disease, illness, or bodily malfunctions exclusion in each policy. The Court finds instructive the cases of Hall v. Metropolitan Life Insurance Co., 398 F. Supp. 2d 494 (C.D. Cal. 2005), and Scar v. Hartford Life Insurance Co., 242 F. Supp. 2d 708 (N.D. Cal. 2003). In Hall, which was an ERISA case, the court found that death from anaphylaxis resulting from a bee sting was excluded from coverage as a "death . . . caused or contributed by . . . bodily or mental infirmity." Id. at 501. In Scar, the court held that fatal pulmonary embolism two weeks after surgery was a "sickness or disease" and not an accident. The court assumed that the embolism stemming from the insured's knee replacement surgery was the proximate cause of the insured's death, and held that the death was not caused by an unforeseen, external event qualifying as an "accident" triggering coverage under the insured's accidental death policy pursuant to California law, given that the insured chose to have surgery, that the embolism was a physical process which happened within the insured's body, and that the embolism was a likely enough consequence of surgery that the insured's surgeon took preventative measures against it. Scar, 242 F. Supp. 2d at 711.

Here it was not unreasonable for Federal to conclude that Mr. McAuley suffered a "bodily malfunction" in response to the flight, especially in light of the expert opinions

Plaintiffs presented.  Like the court in Scar, Plaintiffs' own experts described it as a "widely recognized risk."  (Pls. Ex. 9.)  Dr. Hyers further noted that "the condition is rare and the absolute risk to air travelers is low" and that "death from this condition is rare, even after long-distance flights."  (Pls. Ex. 14.)   As a possible explanation for why Mr. McAuley suffered this condition when others do not, Dr. Matuschak noted the possibility that "certain genetic causes" might have modestly increased Mr. McAuley's risk of developing DVT, but that these were not genetic conditions for which he normally would have been screened. (Pls. Ex. 8.)  While a conclusion that Mr. McAuley's development of DVT falls within the definition of a "bodily malfunction" is not the only possible interpretation, it is not an unreasonable one.

Plaintiffs argue that Defendants are precluded from relying on the "bodily malfunction" exclusion because neither of the SPDs reference that term.  The Business Travel SPD excludes benefits for losses "connected with . . . sickness or disease."  (Pls. Ex. 5 at 6.)  The Blanket Accident SPD (Pls. Ex. 4 at 7) similarly references only "losses connected with . . . sickness, diseases" or certain described infections.  As discussed above, the case law recognizes that limitations in benefits not contained in the SPD should not be applied against a beneficiary.  Plaintiffs further argue that the difference in language is significant, as ERISA, 29 U.S.C. § 1022(b), requires that an SPD contain a description "of the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."

Defendants correctly note, however, that under Eighth Circuit law, where, as here,

the SPD is silent and the policy language is more specific, a beneficiary who seeks to recover based on the faulty SPD must show "reliance on or prejudice from the faulty plan description." Koons, 367 F.3d at 776. Plaintiffs have shown no such reliance or prejudice from the omission of this particular reference in the SPDs. To the extent that the SPDs' failure to mention bodily malfunctions precludes Federal from relying on that language in the policies' exclusions, however, the Court notes that reliance on the Disease or Illness exclusion was just an alternative basis for the denial of benefits.

For all of the foregoing reasons, the Court concludes that Federal was reasonable in concluding that regardless of whether Plaintiffs' claim for benefits fell within the coverage clause, recovery would still be excluded as "bodily malfunction."

## De Novo Review of the Denial of Benefits

The Court further believes that even under de novo review, the same conclusion would be reached. When conducting de novo review of the denial of ERISA-governed benefits, a court looks to federal common law to construe disputed terms in a plan. King, 414 F.3d at 998. The court may, however, look to state law for guidance to the extent that such law does not conflict with the provisions of ERISA. Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir. 1995); Brewer v. Lincoln Nat. Life Ins. Co., 921 F.2d 150, 154 (8th Cir. 1990).

Under the federal common law that has developed in this area, when reviewing an ERISA-regulated insurance policy de novo, the policy terms should be accorded their "ordinary meaning as a reasonable person in the position of the [plan] participant, not the

actual participant, would have understood the words to mean." Adams, 364 F.3d at 954; see also Wilson v. Prudential Ins. Co. of Am., 97 F.3d 1010, 1013 (8th Cir. 1996). An ERISA plan "should be interpreted as to give meaning to all of its terms -- presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." Harris v. The Epoch Group, L.C., 357 F.3d 822, 825 (8th Cir. 2004). When a district court conducts de novo review, it is not limited to the administrative explanation of the denial of benefits. See Donatelli v. Home Ins. Co., 992 F.2d 763, 765 (8th Cir. 1993).

Upon de novo review of the entire record, and the relevant case law, the Court concludes that Federal's interpretation and application of the policies in question here were not only reasonable, but also correct. The denial of insurance benefits under the coverage clauses reflects the kind of insurance the parties to the policies bargained for and intended. For the reasons set forth above, the Court finds that Defendants' argument that the language of the extension for exposure to elements, in common usage, was intended to reference such matters as weather conditions, and not the fact that one remained seated, is the most reasonable interpretation.

Even if this Court were to adopt Plaintiffs' expansive view that "Accident" includes all elements to which Mr. McAuley was exposed, Plaintiffs' claim still fails. As set forth above, it is Plaintiffs' burden to demonstrate coverage under the plan. For the reasons set forth above, Plaintiffs have failed to demonstrate that Mr. McAuley's unfortunate death was caused by an "unavoidable" exposure to any such elements, as required by the policies. Plaintiffs' experts list as possible contributing factors dehydration and immobilization, but

Plaintiffs presented no evidence that such factors, if present, were unavoidable. And to the extent Plaintiffs now rely on hypoxia or low humidity, they have presented no evidence, other than their listing as possible but unproven causes in a single research article, that these particular factors were the causes of Mr. McAuley's DVT. See Hall, 398 F. Supp. 2d at 501. These matters are not Defendants' burden to disprove -- they are Plaintiffs' burden to prove, and they have not done so here. Thus, even under a de novo standard, the Court would find that Plaintiffs have not shown that they are entitled to benefits under the policies.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED**. [Doc. #62]

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment is **DENIED**. [Doc. #59]

An appropriate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of March, 2009.